## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

FINANCIAL EQUIPMENT COMPANY, INC.,

        Plaintiff,

    v.                                      Case No. 10-C-794

MICHAEL SILVA,

        Defendant.

## DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### I. PROCEDURAL BACKGROUND

This action was commenced on August 12, 2010, when Financial Equipment Company, Inc. ("FECO") filed an complaint against Michael Silva ("Silva") in state court, alleging breach of a non-compete agreement, misappropriation of trade secrets, misappropriation of confidential information, and unfair competition. In state court FECO also sought injunctive relief against Silva. On September 14, 2010, Silva removed the action to federal court. Presently before this court is FECO's motion for a preliminary injunction. As with its motion for injunctive relief in state court, FECO asserts in this court that it is entitled to a preliminary injunction against Silva predicated on claims for breach of a non-compete agreement, misappropriation of trade secrets and confidential information, and unfair competition. The briefing on FECO's motion is now complete. Furthermore, on October 29, 2010, the parties presented oral argument on the plaintiff's motion. Thus, FECO's motion for preliminary injunction is now ready for resolution. Despite a most valiant effort on the part of FECO's counsel to

persuade the court otherwise, for the reasons set forth below, the court will deny FECO's motion for a preliminary injunction.

## II. FACTUAL BACKGROUND

The following constitutes some of the essential factual background giving rise to this lawsuit.

Silva began working for Financial Service & Pneumatics Inc. ("Financial Service") as a service technician in February 2004. (Pl.'s Br. 3.) He signed an employment agreement with Financial Service on February 16, 2004, which described his position and imposed certain post-employment restrictions. (Callahan Aff., Ex. 1.) Specifically, the agreement provided:

Section 7.    Covenant Not to Compete

7.1    Covenant. For a period of two years after the Employee's employment with the Corporation has been terminated by either party, the Employee will not directly or indirectly:

7.1.1    enter into or attempt to enter into the "Restricted Business" (as defined below) within a 120 mile radius of the Corporation's business office;

. . .

7.1.3    use contracts, proprietary information, trade secrets, confidential information, customer lists, mailing lists, goodwill, or other intangible property used or usefull (sic) in connection with the Corporation's business.

. . .

7.3    Restricted Business.    The term "Restricted Business" means the business engaged in by the Corporation while the Employee is an employee of the Corporation. Nevertheless, the Employee may own not more than five percent of the outstanding equity securities of a corporation that is engaged in the Restricted Business.

(Callahan Aff., Ex. 1.)

Sometime in 2006, Silva joined FECO as a sales representative. (Pl.'s Br. 3.) Silva primarily

worked with customers in northern Illinois and did not service accounts located in Wisconsin. (Def.'s Br. 3.) FECO is in the business of selling, installing, and servicing security equipment used by banks and credit unions. (Pl.'s Br. 2.) FECO utilizes sales representatives to meet the day-to-day needs of individual customers or accounts and to develop new accounts. (Pl.'s Br. 2–3.) The sales representative interacts with the customers on a regular basis and is the person the customer would contact for service work or new security equipment. (Pl.'s Br. 2–3.)

Silva worked closely with many of FECO's customers, including MB Financial Bank, NA ("MB Bank"), which is a bank based in Chicago, Illinois. (Pl.'s Br. 7–8.) MB Bank has over $10 billion in assets and more than ninety physical branch locations in northern Illinois and Indiana. (Pl.'s Br. 7.) MB Bank has been FECO's customer for over seventeen years and comprises more than fifty percent of FECO's total sales. (Pl.'s Br. 7.)

On July 20, 2010, Silva resigned from his employment with FECO and began working for Dakota Security Systems, Inc. ("Dakota"), a company that specializes in security systems for a variety of industries. (Pl.'s Br. 4; www.dakotasecurity.com.)

### III. ANALYSIS

In order to obtain injunctive relief, a plaintiff bears the burden of establishing: (1) a reasonable likelihood of success on the merits; (2) irreparable harm will ensue absent an injunction; and (3) no adequate remedy at law exists. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002); *Kiel v. City of Kenosha*, 236 F.3d 814, 815 (7th Cir. 2000). If this threshold showing is made, the court considers two additional factors. First the court must balance the harm to the plaintiff if the preliminary injunction is not issued, against the harm to the defendant if the injunction is wrongfully granted. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994). This balancing

3

involves a sliding scale analysis: if the plaintiff's chances of success on the merits are great, then the plaintiff may make a lesser showing that the balance of harm is in the plaintiff's favor (and vice versa). *Id.*; *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1453 (7th Cir. 1995). Finally, the court should consider the public interest served by granting or denying the motion. *Promatek Indus., Ltd*, 300 F.3d at 811. The parties implicitly agree that Wisconsin law applies to FECO's claims.

### A. Reasonable Likelihood of Success on the Merits

#### 1. Breach of Contract

Restrictive covenants "are prima facie suspect as restraints on trade that are disfavored at law, and must withstand close scrutiny as to their reasonableness." *Star Direct, Inc. v. Dal Pra*, 767 N.W.2d 898, 905 (Wis. 2009). Wisconsin courts therefore require that a restrictive covenant be construed in favor of the employee. *Id*. The applicable law on restrictive covenants in employment contracts is Wis. Stat. § 103.465. The statute provides that a covenant not to compete "is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal." Wis. Stat. § 103.465.

In order for a court to find a restrictive covenant enforceable under the statute, the covenant must: (1) be necessary for the protection of the employer, that is, the employer must have a protectable interest justifying the restriction imposed on the activity of the employee; (2) provide a reasonable time limit; (3) provide a reasonable territorial limit; (4) not be harsh or oppressive as to the employee; and (5) not be contrary to public policy. *Lakeside Oil Co. v. Slutsky*, 98 N.W.2d 415, 419–21 (Wis. 1959). If the restrictive covenant fails to meet any one of the criteria listed above, the covenant is unenforceable. The burden of proving the reasonableness of an employment contract's non-compete covenant is on the employer. *Star Direct*, 767 N.W.2d at 905.

Additionally, the statute provides that "[a]ny covenant . . . imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint." Wis. Stat. § 103.465. Therefore, a court must determine not only the reasonableness of the clause, but whether an unreasonable clause is divisible from the remaining clauses in the covenant. Generally, if a court finds a restraint unreasonable, the rest of the covenant is also unenforceable. *Star Direct*, 767 N.W.2d. However, if a court strikes an unreasonable provision, the covenant may still be enforceable if the remaining provisions can be understood and independently enforced. *Id*. In other words, "[r]estrictive covenants are divisible when the contract contains different covenants supporting different interests that can be independently read and enforced." *Id*.

In addressing the reasonableness of each covenant not to compete, the court will also examine whether Silva was subject to an employment agreement at all. Recall that the only employment agreement that was signed by Silva was with Financial Service, not with FECO. Nevertheless, FECO argues that Silva is subject to the employment agreement that he signed with Financial Service in 2004 and that FECO may enforce this agreement because Financial Service and FECO merged in 2009. Alternatively, FECO claims that Silva is subject to FECO's employment agreement, which Silva did not sign, because Silva submitted a counterclaim for unpaid commissions on his sales while working for FECO. FECO claims that this counterclaim specifically references the commission schedule set forth in its employment agreement, and, therefore, Silva has admitted to being subject to the agreement. The court will discuss each covenant below.

a. Financial Service's Employment Agreement

Silva signed an employment agreement with Financial Service in 2004, when he began working for that company as a service technician. In 2006, Silva left Financial Service and joined FECO as a

sales representative. (Def.'s Br. 3.) When Silva left Financial Service, the covenant not to compete with Financial Service was enforceable for two years, causing the covenant to expire in 2008. FECO claims that it merged with Financial Service in 2009, approximately one year after the restrictive covenant expired. (Pl.'s Br. 2.)

Even if FECO had produced documents evidencing a merger, which it has not, the restrictive covenant would still be unenforceable by FECO because the covenant would be equally unenforceable by Financial Service three years after Silva terminated his employment with Financial Service. The court therefore finds that it is not reasonably likely that FECO will prevail on this issue.

However, for sake of completeness, the court will evaluate the reasonableness of the covenant, assuming that it were enforceable by FECO. In doing so, the court will examine the likelihood that the covenant would be found reasonable under the five steps listed above. To adequately evaluate the reasonableness of the covenant, the court will break down the analysis by discussing Subsection 7.1.1 ("Non-Compete Clause") first and then moving to Subsection 7.1.3 ("Confidentiality Clause").

At step one, the covenant must be necessary for the protection of the employer. FECO argues that Silva's position as a route salesman allowed him to form a personal relationship with customers and he would therefore be capable of taking FECO's customers with him when he terminated employment. This situation is very similar to that discussed in *Star Direct, Inc. v. Dal Pra*, 767 N.W.2d 898 (Wis. 2009). In *Star Direct*, Dal Pra was a route salesman in a competitive business. *Id*. at 902. He had the opportunity to develop relationships with the customers and to gain specific knowledge about the customers' wants and needs. *Id.* at 906–07. The Supreme Court of Wisconsin noted that "[r]oute salespeople generally pose an elevated threat to the employer's business due to the special personal relationships, rapport, and goodwill they develop with the employer's customers while in the employer's

service." *Id*. at 906. Ultimately, the court found that a route salesperson who has personal relationships with the employer's customers can constitute a threat to that employer, and therefore, the employer may utilize a restrictive covenant to protect itself. *Id*. at 905–11.

Based on the information that has been submitted to this court, it appears that Silva formed personal relationships with his customers, including persons at MB Bank. He had intimate knowledge of each customer's current and future plans and the products necessary to assist in those plans. Like Dal Pra, Silva's specific knowledge of FECO's customers made him a threat to his employer. Therefore, FECO had a protectable interest justifying a restrictive covenant, satisfying step one of the five-step test.

At step two, the court must determine whether the covenant provides a reasonable time limit. Here, the covenant not to compete extends "for a period of two years after [Silva's] employment with [Financial Service] has been terminated by either party . . . ." Two-year time restrictions are generally considered reasonable in Wisconsin. *Chuck Wagon Catering, Inc. v. Raduege*, 277 N.W.2d 787, 793. For example, in *Lakeside Oil Co. v. Slutsky*, 98 N.W.2d 415, 417 (Wis. 1959), Lakeside Oil employed Slutsky as a salesman where he formed personal relationships with the customers. The court found that a two-year time restriction was reasonable based on the circumstances because it provided the employer a reasonable chance at retaining the customers before the former employee could interfere. *Id.* at 420. *See also Eureka Laundry Co. v. Long*, 131 N.W. 412, 413–415 (Wis. 1911) (finding an employment agreement with a two year restrictive covenant reasonable and valid for a route salesman who made frequent and regular customer contacts); *Techworks, LLC v. Willie*, 770 N.W.2d 727, 731 (Wis. Ct. App. 2009) ("[A] two-year non-compete limitation is within the ambit of reasonableness.")

The two-year restriction is likely reasonable here because Silva was in regular contact with his customers, like the salesman in *Eureka*, and the restriction is likely necessary to protect the employer's

7

interest. Two years gives the employer a reasonable chance at retaining the customer before the terminated employee may lure the customer away. Based on the circumstances of this case and the law presented above, the covenant's time restriction is likely reasonable.

Step three requires that the covenant provide a reasonable territorial limit. "In Wisconsin a covenant is considered reasonable as to territory if . . . it is limited to the route or customers defendant actually services." *Chuck Wagon Catering, Inc. v. Raduege*, 88 Wis. 2d 740, 754 (Wis. 1979). Financial Service's covenant not to compete provided for a territorial restriction of a 120 mile radius from the company's Germantown, Wisconsin office. (Callahan Aff., Ex. 1.) FECO argues that this restriction is appropriate because Silva primarily worked in northern Illinois, and FECO points out that downtown Chicago is approximately 110 miles from the company's Germantown, Wisconsin office. (Pl's Br. at 17.) Silva argues, however, that this restriction is unreasonable because it extends to such distances as Green Bay and Appleton, Wisconsin, which are areas where Silva did not perform services as an employee of FECO. (Def.'s Br. at 11.) In fact, Silva did not have relationships with any of FECO's clients in Wisconsin. (Def.'s Br. at 3.) Such being the case, this restriction is not "limited to the route or customers defendant actually service[d]." Instead, it appears to encompasses a much larger area than necessary for FECO's protection. Therefore, the court is not persuaded that the territorial restriction would likely be considered reasonable.

At step four, the court must determine whether the covenant is harsh or oppressive to the employee. Under the Non-Compete Clause, the covenant would bar Silva from soliciting clients within 120 miles of FECO's Germantown, Wisconsin office. However, he could still solicit customers beyond that radius, including customers south of Chicago. Additionally, Silva could work in a different department at Dakota that would not conflict with the services offered by FECO. Although this would

8

likely not be preferable to Silva, the covenant does not create a harsh or oppressive situation for him because Silva would be capable of performing either in a different department with the same employer or with a different employer or in a different location.

Finally, step five requires that the covenant not be contrary to public policy. The Supreme Court of Wisconsin explained the public policy analysis as follows:

> In considering the reasonableness in respect to the interest of the general public there must be weighed the interest of the public in having access to the employee's particular services during the time and in the area restricted with the benefits that accrue to the public from such restrictive covenants in creating opportunities for employment.

*Lakeside Oil*, 98 N.W.2d at 421.

If the Non-Compete Clause were enforceable, Silva would be unable to continue in his position as a salesperson for Dakota, at least within that area of northern Illinois captured within the defined territory, for two years from his termination at FECO. By removing Silva from the market, many customers would no longer have Dakota's services as provided by Silva, unless Dakota simply put another salesperson in Silva's place for the relevant time period. Because Silva is likely not the only person available within Dakota to service the accounts, the customers would not be at a disadvantage; nor would Silva's unavailability create a monopoly by FECO. Therefore, it is unlikely that the Non-Compete Clause would be contrary to public policy.

In sum, the court finds that FECO would likely prevail on four of the five steps necessary to establish the reasonableness of the Non-Compete Clause (assuming of course that FECO could enforce the employment agreement between Financial Service and Silva, which this court has already found to be unlikely).

The court now turns to the Confidentiality Clause. The analysis under steps one and two for the

Confidentiality Clause is identical to the analysis conducted above for the Non-Compete Clause, so I will not repeat that analysis here. Additionally, step three, which analyzes the reasonableness of a territorial restriction, is inapplicable because the Confidentiality Clause contains no territorial restriction. The court will therefore discuss only steps four and five of the five-step analysis.

At step four, the court examines whether the clause is harsh or oppressive to the employee. Under the Confidentiality Clause, Silva would be unable to directly or indirectly "use contracts, proprietary information, trade secrets, confidential information, customer lists, mailing lists, goodwill, or other intangible property used or usefull (sic) in connection with the Corporation's business" for two years after Silva's termination. The Supreme Court of Wisconsin's decision regarding the confidentiality clause in *Star Direct* is informative. 767 N.W.2d 898 (Wis. 2009). In *Star Direct* the court summarized the confidentiality clause as follows:

> The confidentiality clause bars Dal Pra, for 24 months following his termination, from using or disclosing "any information or knowledge, known, disclosed or otherwise obtained by him during his employment by Employer or CB Distributors." It then lists a variety of specific information that is to be deemed confidential and protected, including but not limited to knowledge "conceived, discovered or developed by Employee or CB Distributors," "proprietary products or procedures," trade secrets, customer lists, "marketing techniques which are not generally known in the business community, and which relate to the business of the Employer or CB Distributors or are in the nature of trade or business secrets," mailing lists, and special pricing information.

*Id*. at 912.

The *Star Direct* court noted that the language prohibited Dal Pra's use of confidential information of the types listed, all of which were of a confidential and sensitive nature and would be "deleterious to Star Direct's business" if shared with competitors. *Id*. Ultimately, the court held that because of the confidential nature of the items listed, the restriction was reasonably necessary for Star

Direct's protection and was therefore enforceable. *Id.* at 913.

The confidentiality clause in the present case includes language similar to that found in the restriction in *Star Direct*. Specifically, it prohibits the use of "proprietary information," "trade secrets," "confidential information," "customer lists," and "mailing lists," all of which the Wisconsin Supreme Court in *Star Direct* found to be confidential information that an employer could protect with a restrictive covenant. Although "contracts" were not specifically mentioned in *Star Direct*, this court finds that the term "contracts", as found in the Financial Service Confidentiality Clause, would likely fall into the category of protectable confidential information. Therefore, it would be reasonable to prohibit the dissemination of this type of information.

I struggle, however, to understand how "goodwill" and "other intangible property used or usefull (sic) in connection with the Corporation's business" would fit within the context of a confidentiality clause. "Goodwill" is defined as that element of value "which inheres in the fixed and favorable consideration of customers arising from an established and well-conducted business." *Spheeris v. Spheeris*, 155 N.W.2d 130, 135 (Wis. 1967) (quoting *Colton v. Duvall*, 237 N.W. 48, 49 (Mich. 1931)). Wisconsin cases generally address goodwill, not as a separate type of protectable information, but as a part of the business that is protected by the covenant not to compete. *See Techworks, LLC v. Willie*, 770 N.W.2d 727, 734 (Wis. Ct. App. 2009) (the purpose of a restrictive covenant is to prevent an employee from taking the goodwill the employee created with the former employer's customers and using it to compete with the former employer); *H&R Block v. Swenson*, 745 N.W.2d 421, 426 (Wis. Ct. App. 2007) ("The customer goodwill that comes from a positive relationship between a customer and the employee with whom the customer regularly deals is a valuable asset . . . . The purpose of a time restriction in this context is to give the employer a reasonable chance to keep the customers.") (internal citation omitted).

11

The plaintiff does not discuss how "goodwill" can be a separate type of confidential information. Indeed, the court is unable to find an example, and the plaintiff has not provided one, where Silva could "use . . . goodwill" to the detriment of the employer, separate from the Non-Compete Clause. Therefore, the court finds that it is unlikely that this provision would be held reasonable.

Additionally, the "use . . . [of] other intangible property used or usefull (sic) in connection with the Corporation's business" is equally ambiguous. The Wisconsin Supreme Court has utilized Black's Law Dictionary to define intangible property, and so I will look to that same dictionary to determine the meaning, as it is used in the covenant, of "intangible property." *See Adams Outdoor Adver., Ltd. v. City of Madison*, 717 N.W.2d 803, 820 (Wis. 2006); *In re Estate of Larson*, 538 N.W.2d 802, 803 (Wis. Ct. App. 1995). In Black's Law Dictionary, "intangible property" is defined as "[p]roperty that lacks a physical existence." Black's Law Dictionary (9th ed. 2009). Examples of intangible property include stock options and goodwill. Black's Law Dictionary (9th ed. 2009). Based on this definition, the language used in the covenant appears immensely broad. Indeed, I wonder how Silva would know whether or not he was using "property that lacks a physical existence" which the company used or found useful in connection with the company's business. Without clearly delineating the type of information covered, as the plaintiff did in *Star Direct*, the employee (and the court) would be unable to determine what is and what is not covered in the confidentiality clause. This has the result of making this portion of the clause both vague and overly broad. Therefore, based on the information presently available to the court, it is unlikely that the clause would be found reasonable. This is because the clause is likely to be harsh or oppressive to the employee.

At step five, the court examines whether the covenant is contrary to public policy. The Confidentiality Clause, despite some of its confusing and ambiguous language, limits the information

12

that Silva may share or use. Although the Confidentiality Clause appears to be somewhat broad and vague, it also covers important information that a company would need to keep secret. The public certainly has an interest in the ongoing success of its local businesses, and protection of confidential information is vital to a company's continued existence. Therefore, it is unlikely that the Confidentiality Clause would be found to be contrary to public policy.

Given the foregoing, as was the case with the Non-Compete Clause, the court finds that FECO would likely prevail on only four of the five steps necessary to establish the reasonableness of the Confidentiality Clause.

In sum, assuming that FECO could enforce the employment agreement between Financial Service and Silva, FECO would likely prevail on four of the five steps for both the Non-Compete Clause and the Confidentiality Clause. But, the employer bears the burden of establishing the reasonableness of the restrictive covenant, and to do this, the employer must prevail on *all* five steps, not merely four. Because FECO would likely prevail on only four of the five steps, it necessarily follows that it is not reasonably likely that FECO would establish the reasonableness of the restrictive covenant.

Because both the Non-Compete Clause and the Confidentiality Clause would likely be considered unreasonable, the court need not address whether an unreasonable subsection of the restrictive covenant might be divisible from the remaining subsections.

In sum, and for the reasons stated above, the court is not persuaded at this stage that FECO has established a reasonable likelihood of success on the merits of its claim that Silva is subject to the 2004 employment agreement with Financial Service.

### b. FECO's Employment Agreement

FECO has not produced a written employment agreement signed by Silva. It has presented, however, a copy of its standard employment agreement, which includes a restrictive covenant and a commission schedule. (Callahan Decl., Ex. A.) Silva asserts that FECO never asked him to sign a restrictive covenant after joining the company in 2006. (Def.'s Br. 3.) Without evidence of a written contract, the court must evaluate whether an oral employment agreement exists.

Wis. Stat. § 103.465, the relevant statute covering restrictive covenants in employment contracts, is silent on whether a covenant not to compete must be written or may be oral. However, Wisconsin does recognize oral employment contracts. *Ashleson v. Labor & Indus. Review Comm'n*, 573 N.W.2d 554, 560 (Wis. Ct. App. 1997). In order for an oral contract to exist, there must be a mutual meeting of the minds and an intent to contract. *Theuerkauf v. Sutton*, 306 N.W.2d 651, 657 (Wis. 1981). Ultimately, whether or not the parties entered into an oral agreement presents a question of fact. *Gerner v. Vasby*, 250 N.W.2d 319, 321 (Wis. 1977).

Here, FECO claims that it had an employment contract with Silva based on Silva's reference in his brief to earned commissions. (Pl.'s Reply Br. 10.) However, Silva claims that he was never approached with an employment agreement and that he therefore never agreed to such a contract. (Def.'s Br. 3.) The record is deplete of information persuasively supporting either party's contention. The parties have merely presented a factual dispute as to whether a contract existed between Silva and FECO. *See Gen. Electric Co. v. Am. Wholesale Co.*, 235 F.2d 606, 608 (7th Cir. 1956) ("An injunction pendente lite should not issue where the parties are in serious dispute on conflicting question of fact.") In order to adequately address the issue, more information, and possibly oral testimony, would be necessary. Therefore, based on the evidence presented and because the plaintiff has not carried its burden of

establishing a reasonable likelihood of success on the merits of this issue, it follows that FECO has failed

to demonstrate a reasonable likelihood of success of the merits of the breach of contract claim.

### 2. *Misappropriation of Trade Secrets*

Under Wisconsin law, a "trade secret" means information: (1) such as a formula, pattern,

compilation, program, device, method, technique or process; (2) that has independent economic value,

available from only one source; and (3) is subject to reasonable efforts to maintain its secrecy. *ECT*

*Intern., Inc. v. Zwerlein*, 597 N.W.2d 479, 482 (Wis. Ct. App. 1999); Wis. Stat. § 134.90 (1)(c). Wis.

Stat. § 134.90(1)(c) specifically provides the following:

> "Trade secret" means information, including a formula, pattern, compilation,
> program, device, method, technique or process to which all of the following apply:
>
> > 1.      The information derives independent economic value, actual or
> > potential, from not being generally known to, and not being readily
> > ascertainable by proper means by, other persons who can obtain economic
> > value from its disclosure or use.
> >
> > 2.      The information is subject to efforts to maintain its secrecy that are
> > reasonable under the circumstances.

Whether certain information meets the definition of a "trade secret" is a question of law. *Nalco*

*Chemical Co. v. Hydro Technologies, Inc.*, 984 F.2d 801, 803 (7th Cir. 1993).

In *MQS Inspection, Inc. v. Bielecki*, 963 F. Supp. 771, 774 (E.D. Wis. 1995), the plaintiff argued

that the defendant misappropriated the plaintiff's business information in order to compete against the

plaintiff. The court held that "customer lists, bids and pricing formulas, pricing information and market

strategies . . . are not trade secrets as defined by Wisconsin's Uniform Trade Secrets Act" and therefore

dismissed the plaintiff's trade secret claim. *Id. See also Square D Company v. Van Handel*, No. 04-C-

775, 2005 WL 2076720, at *8 (E.D. Wis. Aug. 25, 2005) ("In most cases, it would seem, pricing

information will be readily ascertainable by other persons who can obtain economic value from its use . . . . For this reason, and given Wisconsin's strong public policy favoring employee mobility, it is unlikely that a company's pricing information will be found entitled to trade secret protection except in extraordinary cases.")

Like the plaintiff in *MQS Inspection*, FECO claims that Silva misappropriated pending bids, internal pricing information, and vendor pricing information. It argues that these three items are entitled to trade secret protection under Wisconsin's Uniform Trade Secrets Act. However, the cases cited above demonstrate that this type of information is specifically excluded from trade secret protection and therefore the court need not analyze whether the information meets the three factors defining a trade secret. Because bids and pricing information are likely not entitled to trade secret protection, it follows that FECO has failed to establish a reasonable likelihood of success on this claim.

### 3. Unfair Competition

FECO also argues that Silva is liable to FECO for misappropriation of business information and for unfair competition. Because misappropriation of business information is a type of unfair competition, the court will address both arguments below.

There are two categories of unfair competition: misrepresentation and misappropriation. *Desclee & Cie., S. A. v. Nemmers*, 190 F. Supp. 381, 386 (D.C. Wis. 1961). "In exceptional cases, a cause for misappropriation is recognized because the courts, under the particular circumstances of the case, acknowledge an exclusive right in a property or quasi property of such a nature that the mere taking and competitive use thereof is held inequitable and unfair." *Id*. To prove misappropriation, a plaintiff must demonstrate that (1) time, labor, and money were expended in the creation of the thing misappropriated; (2) competition; and (3) commercial damage to the plaintiff. *Mercury Record Prod., Inc. v. Econ.*

*Consultants, Inc.*, 218 N.W.2d 705, 709 (Wis. 1974). "[T]he essence of the cause of action in misappropriation is the defendant's use of the plaintiff's product . . . in competition with the plaintiff." *Id*. at 710 (emphasis added).

First, FECO argues that Silva misappropriated information relating to pending bids, internal pricing information, and vendor pricing information. However, Silva states that FECO shares this information with its customers when competing for projects and that "it is common for customers to share pricing information and portions of bid submissions with a bidder's competitor to try to negotiate better prices." (Silva Decl. ¶ 13.) Not so, says FECO. Instead, FECO asserts that "Internal Pricing Information, the Pending Bids, and the Vendor Pricing information . . . [are] not known by our competitors and (except where necessary) by our customers." (Callahan Aff. ¶ 16.) FECO claims that this information is "highly confidential" and it therefore reminds the "sales employees of the importance of keeping [the] information confidential." (Callahan Aff. ¶ 16.) The parties have therefore presented a dispute on a question of fact and, as noted above, a court should not issue a preliminary injunction where a question of fact exists. *Gen. Electric Co. v. Am. Wholesale Co.*, 235 F.2d 606, 608 (7th Cir. 1956).

Nevertheless, even without a factual dispute, a preliminary injunction based on claimed unfair competition would be unwarranted because FECO has not demonstrated that it has expended time, labor, and money in creating the "product" of bids and pricing information; nor has it established why such information qualifies as a "product." Without a demonstration that the information being protected from unfair competition is a "product," the court is not persuaded that FECO would prevail on its unfair competition claim with respect to pending bids, internal pricing information, and vendor pricing information.

Second, FECO argues that Silva misappropriated the "long-lasting relationships with [FECO's] customers" after Silva began employment with Dakota. However, FECO has failed to demonstrate how "long-lasting relationships with its customers" are of such an extraordinary character as to warrant protection under a misappropriation cause of action. Customer relationships, based on the circumstances of the case, seem not qualified to be the "exclusive right" of FECO, as described in *Mercury Record*. In fact, such relationships are likely cultivated by competitors as well, and are therefore not the sole "product" of FECO. Additionally, FECO presents no argument as to why the court should consider these relationships a "product" of the company. Although the relationships undoubtedly assist the company in selling its products and services, the court finds no evidence that such relationships are a product warranting protection under the law of unfair competition.

Further, FECO has not demonstrated that it expended time, labor, and money in "creating" this "product." FECO has not presented the court with the hours or money expended to "create" the "long-lasting relationships with its customers." FECO merely offers a conclusory statement that "[FECO] has invested time, labor, and money in creating and retaining" these relationships. (Pl.'s Br. 15.) Without more, the court is not persuaded that FECO has met its burden of demonstrating a reasonable likelihood of success on the merits of its unfair competition claim.

### 4. Conclusion

Based on the information available at this stage of the litigation, the court finds that FECO's likelihood of success on the merits of its claims is meager, at best. Therefore, FECO must make a proportionately stronger showing that the balance of harms, which is discussed below in Section III. D., weighs in its favor. *See Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 315 (7th Cir. 1994) ("Once the district court determined that Storck's likelihood of success on the merits of its claim was slight, it

required Storck to make a proportionately stronger showing that the balance of harms was in its favor.")

## B. Irreparable Harm

To demonstrate irreparable harm, the party seeking a preliminary injunction must show that it will suffer harm that cannot be prevented or fully rectified by the final judgment after trial. *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 478 (7th Cir. 2001). If the harm is reparable by an award of damages at the end of the trial, then the preliminary injunction is unnecessary. *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003).

FECO argues that it will suffer irreparable harm if Silva continues to interact with its customers. Specifically, FECO worries that Silva's continued relationship with MB Bank will cause FECO to lose MB Bank's business. (Pl.'s Br. 23–24.) If FECO loses MB Bank's business, FECO claims it may be required to lay off employees or possibly cease to exist. (Pl.'s Br. 24.) MB Bank, as stated above, comprises fifty percent of FECO's annual sales. FECO therefore argues that losing MB Bank's business could be devastating to FECO's continued existence. (Pl.'s Br. 24.)

FECO claims that the circumstances in the present case are similar to those in *Foodcomm Int'l v. Barry*, 328 F.3d 300 (7th Cir. 2003). In *Foodcomm*, two Foodcomm employees approached Foodcomm's customer, Empire Beef, with a plan to organize a start-up company to directly compete with Foodcomm's sale of Australian chilled beef to Empire Beef. *Id.* at 302. The two employees incorporated a company in July 2002 and then resigned from Foodcomm in August 2002. *Id.* In September of 2002, the former Foodcomm employees began importing Australian chilled beef as a division of Empire Beef. *Id.* The Court of Appeals affirmed the district court's decision to grant a preliminary injunction because it found that the two former employees' continued business with Empire Beef during the litigation would likely result in a complete loss of Foodcomm's relationship with Empire

Beef.  *Id*. at 304.  Additionally, the former employees had no significant assets in the United States and the start-up company (i.e., Outback Imports, which was a division of Empire Beef) had no assets.  *Id*. at 305.  Therefore, the court found that a preliminary injunction was appropriate to prevent any potential harm from continuing and because damages would likely be uncollectable.  *Id*.

The present case, however, differs from *Foodcomm* in several respects.  First, Silva did not begin employment with MB Bank.  Instead, he went to a competitor of FECO's and has to compete, just like FECO, to win bids for MB Bank's projects.

Second, although FECO claims to fear a potential breakdown in its relationship with MB Bank, the bank has already been FECO's customer for seventeen years.  Silva serviced the account for only a maximum of four years, evidenced by the fact that he began employment with FECO as a salesperson in 2006 and terminated employment in 2010.  Thus, FECO has maintained a relationship with MB Bank for close to two decades, despite at least one change in salespersons before Silva.  Simply stated, I am not persuaded that the relationship cannot be maintained during this employment change as well.

Third, nothing in the record indicates that FECO would be unable to collect damages from Silva due to insolvency or lack of assets.  The court in *Foodcomm* noted that the defendants lacked assets, both personally and within the business, and would therefore be unable to pay any damages awarded to the plaintiff.  Because no evidence as to Silva's lack of financial stability has been presented, I do not see this as an insurmountable issue.  Therefore, the result in *Foodcomm* is not applicable here.

FECO has not shown that it will suffer irreparable injury without an injunction.  Indeed, the injury alleged, i.e., loss of business, is likely more appropriately rectified with monetary damages from lost profits.  Therefore, I am not persuaded that FECO is likely to suffer irreparable harm if the court does not issue a preliminary injunction.

## C. Adequate Alternative Remedy

Injunctive relief may be awarded when the remedy at law is inadequate. *Lakeside Oil Co. v. Slutsky*, 98 N.W.2d 415, 422 (Wis. 1959). The purpose of an injunction is to prevent damage, not to compensate for damage caused. *Id*. The fact that damages are difficult to prove is not sufficient to issue a temporary injunction because "[t]he award of damages in a case where injury is difficult to measure is as likely to overcompensate as to undercompensate the injured party." *American Hosp. Supply Corp. v. Hosp. Prod. Ltd.*, 780 F.2d 589, 597 (7th Cir. 1985).

FECO argues that Silva's conduct has jeopardized business relationships and has resulted in lost business. FECO states that "[b]ecause of the potential difficulties in showing whether a job was lost due to Mr. Silva's improper behavior or for other reasons, damages may be hard to quantify." (Pl.'s Reply Br. 25.) Silva argues, however, that if FECO prevails on its claims, it may have established the potential for lost profits, but nothing else. (Def.'s Br. 19.)

This court recognizes that in order to adequately assess actual damages if a preliminary injunction is not issued, the parties will likely need to depose individuals who are working for customers, including MB Bank. I am mindful that such an interaction might be uncomfortable for the parties. But that is not sufficient justification for a finding of lack of adequate alternative remedy.

As stated above, a court may not issue a preliminary injunction simply because the damages might be difficult to measure. And FECO bears the burden of establishing that no adequate alternative legal remedy exists and that therefore the court should issue a preliminary injunction. Despite a laudable effort on the part of its counsel, FECO has failed to carry this burden.

To be sure, FECO has argued the potential difficulty of calculating damages. However, as discussed above, the court finds that there are adequate alternative remedies available to FECO, i.e.,

money damages. Therefore, the court finds that FECO is unable to establish this necessary element for a preliminary injunction.

### D. Balancing of Harms and Public Interest

Once a plaintiff has made a threshold showing of reasonable likelihood of success on the merits, irreparable harm, and no adequate alternative remedy, the court must then balance the harm to each party and consider the public interest served by granting or denying the motion for preliminary injunction. However, FECO has not met the threshold showing. Thus, the court need not address these two additional factors because the outcome of the two remaining factors would have no effect on the issuance of a preliminary injunction.

### IV. CONCLUSION

The court is not persuaded, at this stage of the proceedings, that a preliminary injunction is appropriate. FECO has failed to persuade the court that it has a reasonable likelihood of success on the merits of its claims, that it would suffer irreparable harm absent a preliminary injunction, and that an alternative remedy at law does not exist. Therefore, the court will deny FECO's motion for a preliminary injunction.

**NOW THEREFORE IT IS ORDERED** that the plaintiff's motion for preliminary injunction be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that counsel for the parties shall appear for a Rule 16 conference at **9:15 a.m.** on **Monday, December 20, 2010**, in Courtroom 242, U.S. Courthouse, 517 East Wisconsin Avenue, Milwaukee, Wisconsin 53202. Each party shall follow the procedures set forth in Rule 26 of the Federal Rules of Civil Procedure.

**IT IS FURTHER ORDERED** that the parties shall file their Rule 26(f) report on or before **December 13, 2010**, in order to assist the court in conducting the Rule 16 conference. The report should contain the following information:

1.      A brief description of the nature of the case, including a statement regarding the basis of subject matter jurisdiction.

2.      Whether the parties contemplate amending the pleadings by joining parties or for other reasons.

3.      Any motions which are currently contemplated.

4.      The estimated length of trial and whether a jury is requested.

5.      Such other matters as may affect the scheduling of this case for final disposition.

Since this case has been designated for electronic filing, documents must be submitted in Portable Document Format (PDF) and shall be filed electronically using the Court's internet-based Electronic Case Files (ECF) system. Registered users may file documents directly into ECF. Please see the Court's web site at wied.uscourts.gov for more information on electronic case filing.

If counsel is located more than fifty miles from the courthouse, and wishes to participate telephonically, please contact the court's deputy clerk, Chrissy Stanton, at 414-297-1835 at least one week prior to the scheduling conference with a telephone number where you can be reached at the above-scheduled time. The court will initiate the call.

**SO ORDERED** this 17th day of November, 2010 at Milwaukee, Wisconsin.

**BY THE COURT:**

s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge